**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **DAVID S. MEZEBISH AND** | ) | |
| **THERESA M. MEZEBISH** | ) | |
| **2417 SAPLING RIDGE LANE** | ) | **CASE NO. 17-1056** |
| **BROOKEVILLE, MD 20833-1830** | ) | |
| | ) | |
| | ) | |
| **PLAINTIFFS,** | ) | |
| **V.** | ) | |
| | ) | |
| **UNITED BANK, INC.** | ) | |
| **A WEST VIRGINIA** | ) | |
| **CORPORATION** | ) | |
| **SERVE PRESIDENT** | ) | |
| **300 UNITED CENTER,** | ) | |
| **500 VIRGINIA STREET EAST** | ) | |
| **CHARLESTON, WEST** | ) | |
| **VIRGINIA 25301** | ) | |
| | ) | |
| | ) | |
| **SERVE ALSO, RESIDENT** | ) | |
| **AGENT:** | ) | |
| **RONALD BREZIER** | ) | |
| **1219 MT. AETNA ROAD** | | |
| **HAGERSTOWN MD 21742** | | |

**DEFENDANT.**

## COMPLAINT

COME NOW David S. Mezebish and Theresa M. Mezebish ("Plaintiffs" or "Mezebishes"), by and through undersigned counsel, and bring this suit against Defendant United Bank ("United" or "Defendant"), stating as follows:

## STATEMENT OF THE CASE

This case centers on a fraudulent scheme involving Defendant United Bank's participation to inflate the value of property in a residential development in Monroe County, West Virginia named Walnut Springs Mountain Reserve ("Walnut Springs" or "WSMR"). Specifically, United

Bank led Mr. and Mrs. Mezebish to believe that the money they borrowed to purchase their WSMR land was supported by the value of their real estate purchase and subsequent refinance. United knew that the value of the land was not sufficient to secure first the purchase and then the construction of their West Virginia home.

Plaintiffs discovered that United was aware of the fraudulent activities surrounding WSMR on October 27, 2016, when they received a copy of a draft letter sent by one of the original developers' attorneys, to the Vice President of United Bank in Fayetteville, WV which detailed the manner in which the developers made a bogus sale to artificially increase the value of the property. Instead of advising the Mezebishes of the fraudulent activities, United said nothing and continued to finance the development using appraisals which were supported by the Schonberger fraudulent sale. The Schonberger fraud was known only by the developers, United Bank and its appraisers. Had Plaintiffs been advised of the fraudulent transactions and ongoing criminal investigation; they would have never invested in WSMR.

## PARTIES AND JURISDICTION

1. Plaintiffs David S. Mezebish and Theresa M. Mezebish are husband and wife and are residents of the property located at 2417 Sapling Ridge Road, Brookeville, Maryland 20833.
2. Defendant United Bank is a West Virginia Corporation with its principal place of business in Parkersburg, West Virginia.
3. Jurisdiction lies within the District of Maryland because Defendant United Bank has minimum contacts with Maryland and otherwise intentionally avails itself of the Maryland markets as to render the exercise of jurisdiction by Maryland courts permissible under traditional notions of fair play and substantial justice.

4. This Court has jurisdiction over this matter and Defendants pursuant to 28 U.S.C. § 1332 (diversity of citizenship with amount in controversy exceeding $75,000.00).

5. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(a).

**STATEMENT OF FACTS AS TO ALL COUNTS**

**A. The Genesis of the Walnut Springs Development**

6. Walnut Springs is a residential development compromised of approximately 1,000 acres located on Bud Ridge Road near Union, Monroe County, West Virginia.

7. Mr. Daniel Berg ("Berg," formerly known as Dan Schonberger) and Mr. Halperin ("Halperin") were equal members of Mountain America LLC, an LLC created to develop a piece of property called Walnut Springs Mountain Reserve.

8. Mountain America, LLC and its affiliated entities undertook to develop Walnut Springs into a residential housing development and began selling tracks of land beginning in 2004.

9. United Bank Vice President and loan officer R. Leon Cooper (“Leon Cooper”), agreed to form a business partnership and joint venture with WSMR.

10. United Bank entered into a private agreement with Berg and Halperin which allowed the developers to partially pay off respective lots upon which the bank would hold a deed of trust, and which allowed them to retain a certain percentage of the proceeds as profit.

11. United financed most, if not all of the sales in WSMR and was fully aware of market conditions and pricing in the development.

12. Upon information and belief most of the WSMR purchasers lost their property to foreclosure.

**B. The Walnut Springs Scam**

13. On or about August 4, 2004, Mountain America, LLC purchased a 640 acre tract of undeveloped land for $705,711.00. (Approximately $1,100.00 an acre.) $300,000.00 of the purchase price was financed by United Bank.

14. On or about August 27, 2004, Dan Berg's mother, Chaya Schonberger, in her name purchased 67.5 acres from Gary Tincher, for the purchase price of $99,000.00.

15. The Tincher property adjoined the 640 acre tract of land on the West side and at the very top of the mountain which was to be marketed as WSMR.

16. Upon information and belief, Ms. Schonberger paid $29,040.00 down at closing, and financed the remaining $69,960.00 through Leon Cooper and United Bank, as evidenced by the Deed of Trust recorded in the Office of the Clerk of the County Commission of Monroe County, West Virginia.

17. On or about October 12, 2004, Chaya Schonberger, by and through her son, Daniel Berg, using a power of attorney, conveyed two five acre parcels to two individuals, Shoupe and Chamberland, who were employees and insiders of the Walnut Springs development for a total sum of $150,000.00 creating a $15,000.00 per acre comparable.

18. The Chamberland and Shoupe sales provided justification and financing for mortgages priced at $15,000.00 per acre and less. These two sales served as the basis of the fraudulent scheme and were later used as comparables in future appraisals. This sale was listed in WSMR's spreadsheets, as well as on their website, all of which were presented to potential investors/purchasers, as well as United Bank and the appraiser, and which claimed that the sale netted $15,000 per acre.

19. On May 12, 2005, Chaya Schonberger conveyed her remaining 57.5 acres into a limited liability company owned by the developers.
20. The deed from that conveyance excepted 5.88 acres to remain in her name.
21. The 5.88 acre parcel was designated as "Walnut Springs Mountain Reserve Phase 1 Lot 1" and was listed in the books as having been a sale of 5.88 acres for the consideration of $294,000.00.
22. While Chaya Schonberger owned the 5.88 acre lot and the house constructed on it, the lot was never owned by Walnut Springs. This has become known as the Bogus Schonberger Transaction.
23. In other words, while Chaya Schonberger did own the 5.88 acres, there was never a sale of the property to her for a price of $294,000.00. Rather, she owned the property the entire time, having purchased the entire 67.5 acre lot from Gary Tincher in 2004 for $99,000.00.
24. Simultaneously with the "supposed sale" of the 5.88 acre lot, a construction loan was taken out through United Bank with loan officer Leon Cooper.
25. Mr. Cooper had a $300,000.00 limit for which he could solely approve loans.
26. He approved the construction loan for a house to be built on the 5.88 acre parcel in the Walnut Springs subdivision. The way in which this loan file was documented made it appear as if Ms. Schonberger was purchasing the 5.88 acre lot even though she already owned it.
27. The May 12, 2005 sale provided justification to increase the financing from 100% to 400%, ultimately serving as the basis for the Mezebish appraisal. ($15,000.00 an acre to more than $60,000.00 per acre in less than two years).

28. This transaction was then used as the comparable for future appraisals and sales, which appraisals and sales then were used as comparables for other sales, resulting in a pyramid of appraisals and sales all resulting from the Bogus Schonberger Transaction.

29. Plaintiffs were not aware of this fraud until 2016, when their counsel received an email from Jonathan Halperin, the former WSMR developer/partner forwarding a draft of the letter sent by his lawyer, James K. Archibald formerly of the Venable Law Firm, to Mr. Thomas Ward, Vice President of United Bank. *See* email and letter attached as **Exhibit A.**

30. Mr. Archibald's letter to Mr. Ward advised United Bank of Mr. Halperin's discovery of the fraudulent April 2005 sale to Chaya Schonberger.

31. The James K. Archibald October 2005 letter put United Bank on notice that the Schonberger sale was fraudulent and serves as actual notice that "COMPARABLE NO. 1" was not a true comparable for all subsequent sales transactions.

32. The Archibald letter contained as attachments the HUD Settlement Statement for the United Bank loan to Chaya Schonberger, the construction loan United approved for the Schonberger property, the false draw request on the construction loan Mr. Berg caused Mountain America to submit, the United Bank cashier's check made payable to Mountain America and then the endorsed check from Mountain America to Chaya Schonberger for personal expenses wholly unrelated to the construction of a home at Walnut Springs. Each of these documents served as the basis for the Stipulation of Facts which Berg stipulated and agreed to resulting in his guilty plea entered on July 14, 2016.

33. Thus, as early as October 2005, United Bank had actual knowledge that the Schonberger mortgage loan proceeds were not used for the purchase of her property in Walnut Springs,

but instead purportedly were for a construction loan on property already owned by Schonberger.

34. Thus, more than one year prior to the Mezebish purchase, United Bank had actual notice that the 5.88 acre Schonberger "purchase" was fraudulent.

35. Despite being made aware that the Bogus Schonberger Transaction was fraudulent, United continued to finance purchases in Walnut Springs and failed and refused to disclose the fraudulent comparable to unsuspecting customers to its own benefit and the detriment of home owners like the Mezebish family.

36. In July 2011 Leon Cooper plead guilty to a two-count information charging him with bank fraud and tax evasion. Mr. Cooper in his capacity as a Vice President at United Bank approved fraudulent mortgage loan applications for straw purchasers at the Lamplighter Valley subdivision in Lewisburg in Greenbrier County. Mr. Cooper was sentenced to fifty-one months in federal prison and ordered to pay $1.9 million in restitution.

37. Daniel Berg, entered a guilty plea in July 2016 to making a false statement to a financial institution in order to obtain a construction loan from United Bank. Daniel Berg was sentenced to five years' probation and ordered to pay a $2,000 fine.

**C. Plaintiffs' Purchase**

38. Plaintiffs' first communication with Mountain America was via electronic mail to the Director of Sales, Neil Patrick Walsh, on June 18, 2006, after they saw a full-page ad in the Washington Post on Father's Day advertising Walnut Springs Mountain Reserve. Plaintiffs were shown various plots of land and eventually decided to purchase the lot also known as Orange Mountain.

39. On July 12, 2006, Mr. Walsh sent an email to Mr. Mezebish stating, "I contacted Joyce this morning to let her know you might be calling her to discuss financing options."

40. Mr. Walsh, when speaking with Plaintiffs about financing a purchase at WSMR referred to United Bank as "our bank."

41. Upon information and belief, United Bank Vice President and loan officer Joyce Durham was fully aware of the "confidential rebates"[1] which were developed by fellow Vice President Leon Cooper and Dan Berg which were being utilized by WSMR.

42. Upon information and belief, Joyce Durham was at that time a Vice President of mortgages generally for United Bank.

43. Despite an asking price of $1,799,995.00 for Orange Mountain printed in the marketing materials, Mountain America initially dropped the price to $1,500,000.00.

44. Plaintiffs eventually agreed to purchase the property for $1,175,350.00 and were advised by Defendant that there would be an immediate rebate which the bank would accept as a down payment. Walsh directed Plaintiffs to United Bank’s Vice President Brenda Stoffel.

45. Plaintiffs purchased their lot known as 116 Osage Road, Union, WV, in November 2006, and United Bank provided the financing. (the “WV Property”).

46. United used fraudulent business practices in order to make it appear that Plaintiffs were bringing over $442,736.50 to the closing for the West Virginia property.

47. In reality, United had Plaintiffs take out a second mortgage loan on their Maryland home a week prior to the closing of the West Virginia Property.

48. United Bank obtained a second deed of trust on the Maryland Property because it knew that the Mezebish property was not worth the purchase price and construction financing.

---

[1] Upon information and belief “confidential rebates” were used by United Bank resulting in the appearance that property sold for more than the actual purchase price.

49. Specifically, Ms. Stoffel told the Mezebishes that they would have to take out a second mortgage on their primary residence in the amount of $574,000.00.

50. A portion of the proceeds from this loan paid off small existing second and third mortgages on the Maryland residence which put the new United Bank loan in second position with the balance to be utilized for a down payment to purchase the WV property. A copy of the settlement statement is attached as **Exhibit B**.

51. The Mezebishes then obtained a new mortgage loan from United Bank on the WV Property for the sum of $627,000 to finance the purchase.

52. The Mezebishes brought to closing cash in the sum of $442,736.50 and received from WSMR a confidential rebate of $106,850.00 (described on line 209 of the Settlement Statement as "Down Payment by Sellers"). A copy of the Settlement Statement is attached as **Exhibit C**.

53. After relying on United's representations regarding WSMR, Plaintiffs closed on their West Virginia property on or about November 8, 2006 paying over $63,000.00 per acre.

54. To support the purchase price, United retained Sandra Tuckwiler of Hodges, Judy and Associates to appraise the Mezebish WV Property.

55. Ms. Tuckwiller's appraisal references and relies on three comparable properties in the Walnut Spring subdivision. The appraisal report claims that Comparable No. 1 is most similar because the per acre price of Comparable No. 1 is $62,240.00. Comparable No. 1 is not an accurate comparable because it is less than a five-acre property. The Mezebish property in contrast is almost a twenty-three-acre property.

56. Comparable No. 1 was purchased on April 5, 2006 by Robert and Helene Schlossberg.

57. Stanley McQuade performed the appraisal for the Schlossberg purchase on April 5, 2006 which referenced three comparable properties all relying on the Bogus Schonberg Transaction.

58. The third comparable used by Mr. McQuade to justify the Schlossberg purchase was the same exact sale (Comparable No. 3) used by Ms. Tuckwiler to justify the Mezebish purchase.

59. The Mezebishes did not believe that a large and reputable bank would loan hundreds of thousands of dollars to finance the purchase if there were no valid appraisals to support the financing. To date Plaintiffs have paid over a million dollars to United Bank in connection with the mortgages they obtained to finance the WV property. Attached as **Exhibit D** is a copy of the 1099's issued by United to the Mezebishes from 2007-2016.

60. A November 23, 2015 appraisal of the Mezebish property concluded that the market value of the land and its improvements was valued $300,000.00. Attached as **Exhibit E** is a copy of the most recent appraisal.

61. United Bank filed a case in the Circuit Court of Monroe County, West Virginia seeking the sum of $976,415.37 pursuant to the Note for the West Virginia property.

62. Plaintiffs caused the case to be removed from the Circuit Court of Monroe County, WV to the United States District Court for the Southern District Court for the Southern District of West Virginia.

## FIRST CAUSE OF ACTION
## INTENTIONAL MISREPRESENTATION (FRAUD IN THE INDUCEMENT)

63. Plaintiffs re-allege and reassert, as if set forth verbatim herein, each and every allegation contained in Paragraphs 1-62.

64. As set forth above in more detail, the Bank made false representations to Plaintiffs, first obtaining an appraisal which they knew was based on fraudulent comparables, then by making representations to Plaintiffs that the land they were purchasing was valued at $1,175,350.00, finally by structuring a financial package which allowed United to have liens on both the Mezebishes' properties.

65. The Bank knew that such representations to Plaintiffs were false at the time they were made by the Bank.

66. Such false representations by the Bank were made to Plaintiffs for the purpose of inducing Plaintiffs to move forward with the purchase the property.

67. The complete real estate transaction history that involved the original purchase, the closing, the mortgaging, and the construction refinance of the property demonstrate that United Bank was involved and complicit in several non-transparent fraudulent transaction(s) which created conflicts of interest which were not disclosed and transparent to Plaintiffs.

68. These transactions involved several leading United Bank business executives, bank business partners, bank associates, bank business agents, realtors and a real estate developer which facilitated and gained financially at the expense of Plaintiffs.

69. Upon information and belief, Defendant United Bank is, and has been, aware and participated in the fraudulent activity, and has hidden, these facts from its customers and clients, including WSMR purchasers and borrowers.

70. Unbeknownst to Plaintiffs, but well known and relied upon by defendant United, a year prior to the purchase of the West Virginia property, United received a letter advising it of the fraudulent appraisals and land transfers.

71. The actions of the Bank induced Plaintiffs to enter into an agreement to purchase the property and use their Maryland property as collateral.

72. Relying upon the Bank's false representations, Plaintiff's entered into a contract with United and agreed to the purchase price of over $1,000,000.00. Based on the defendant Bank's unlawful and deliberate conduct, Plaintiffs are entitled to actual and punitive damages against the Bank in an amount in excess of $1,000,000.00.

73. United made representations and express promises to the Plaintiffs that the lot they were financing were of a certain minimum value, and that all parties involved were complying with state and federal law and not committing mortgage fraud, bank fraud, or otherwise providing fraudulent sales and financial records in any way.

74. Given the relationship between United Bank and WSMR, which was communicated and promoted to the Plaintiffs, and given United Bank's status as West Virginia's largest bank headquartered in West Virginia, which it readily communicated to the Plaintiffs, Defendant should have reasonably expected that the representations made to the Plaintiffs would be relied upon and given great weight by the Plaintiffs.

75. Plaintiffs only discovered that United had actual knowledge of the fraud on October 27, 2016, when they received a copy of a draft letter and email which detailed the manner in which the developers made a bogus sale to artificially increase the value of the real estate development.

76. The Plaintiffs were induced to purchase property in WSMR and finance the same with the Defendant for an amount far in excess of the actual value of the property, to their detriment, and as a direct and proximate result thereof have suffered damages. The Plaintiffs damages are within the jurisdictional requirements of this Court.

77. Plaintiffs would not have the purchased the property or refinanced it had they known its true value.

78. Plaintiffs justifiably relied upon Defendants' misrepresentations and suffered damages as a direct and proximate result thereon.

79. Defendant Bank willfully made the misrepresentations to Plaintiffs with actual malice.

80. The purchase activity which resulted in ever increasing prices were all based on the Schonberger transaction and each of the appraisals cited in the Mezebish Appraisal Report can be traced back to a sale which relied on the bogus Schonberger sale which United Bank was fully aware of as of the dated of the Mezebish purchase.

WHEREFORE, Plaintiffs demand judgment against Defendant, in the amount of One Million Dollars ($1,000,000.00) in compensatory damages, One Million Dollars ($1,000,000.00) in punitive damages, and for attorney fees, costs and such other relief as this Court deems appropriate.

**SECOND CAUSE OF ACTION**
**CONSTRUCTIVE FRAUD**

81. Paragraphs 1 through 80 are hereby incorporated by reference as though fully restated herein.

82. Defendant owed a legal and equitable duty to the Plaintiffs to not engage in or assist in engaging in actions which deceived the Plaintiffs.

83. Defendant breached said duty by, in addition to the matters set forth above, engaging in the following actions:

a. allowing, enabling and assisting WSMR to give "confidential rebates" to purchasers, thereby falsifying deeds, deeds of trust, loan documents, financial records, appraisals, and other documents, in violation of state and federal law;

b. purposefully hiding said "confidential rebates" and failing to list them on purchasers' settlement statements in violation of state and federal law;

c. approving and closing loans which were based on obviously fraudulent appraisals, when the only parties to whom the fraud would have been obvious were the Defendant;

d. Allowing, enabling, and assisting WSMR to give "rebates" to purchasers that was not supported by the value of the land;

e. Plaintiffs were harmed by paying almost three times the value of the actual land and its improvements.

WHEREFORE, for all the reasons stated herein, the Plaintiffs respectfully pray for the following relief:

A. Compensatory damages related to the purchase, payments and existing debt and interest on the property the Plaintiffs purchased in WSMR, and for such other relief as this Court deems just and fair, in an amount to be determined by a jury at trial;

B. General damages for past, present and future mental anguish, loss of enjoyment of life, emotional distress and loss of good credit history and rating, as well as loss of investment opportunity, and other general compensatory damages, in a fair and just amount to be determined by a jury at trial;

C. Punitive damages, if it is determined that the Defendant was grossly negligent, reckless and/or engaged in intentional misconduct, in an amount to be determined by a jury at trial;

D. Pre-judgment and post-judgment interest;

E. Costs and attorney fees expended in this civil action;

F. And for such other relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION
## BREACH OF CONTRACT

84. Paragraphs 1 through 83 are hereby incorporated by reference as though fully restated herein.

85. United offered to finance the purchase price of the lot known as 116 Osage Road, Union, WV.

86. United hired Sandra S. Tuckwiller to appraise the property and provided Plaintiffs with a copy of said appraisal.

87. Ms. Tuckwiller appraised the property at $1,400,000.00, based upon the fraudulent comparables.

88. United knew the appraisal was not accurate, however it failed to inform Plaintiffs of that fact.

89. There was no "meeting of the minds" because the Defendants failed to disclose material information, such as the bogus Schonberger transaction.

90. If the Defendant had informed Plaintiffs of the Bogus Schonberg Transaction, they would have never agreed to purchase the land for over One Million Dollars.

WHEREFORE, for all the reasons stated herein, the Plaintiffs respectfully pray for the following relief:

a. Reduce the total purchase price of the land and its improvement to the market value of $300,000.00;

b. Return all payments made to by Plaintiffs to United in excess of the $300,000.00;

c. Declare the Notes for both the West Virginia Property and Maryland property paid in full;

d. And for such other relief as this Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

91. Paragraphs 1 through 90 are hereby incorporated by reference as though fully restated herein.

92. Defendant United Bank, due to its contractual relationship with the Plaintiffs, owed the Plaintiffs an implied covenant of good faith and fair dealing.

93. Specifically, this duty arose when Defendant United Bank accepted the Plaintiffs as customers/clients and entered into agreements to loan them money secured by the subject lots in WSMR.

94. As a result of the conduct described above in detail, Defendant breached the implied covenant of good faith and fair dealing.

95. As the result of the Defendant's breach of their implied covenant of good faith and fair dealing, the Plaintiffs were harmed.

96. Had Plaintiffs been made aware of the bogus real estate sales they would not have purchased the property.

97. Had Plaintiffs been made aware of the letter United had received in 2005 outlining the issues with the development, Plaintiffs would not have purchased the property.

98. Had United advised Plaintiffs that the $1,175,350.00 purchase price was not supported by the actual value of the property, Plaintiffs would not have purchased the property.

99. The Defendant is liable to the Plaintiffs for breach of their implied covenant of good faith and fair dealing.

WHEREFORE, for all the reasons stated herein, the Plaintiffs respectfully pray for the following equitable relief:

a. Reduce the total purchase price of the land and its improvement to the market value of $300,000.00;

b. Return all payments made to by Plaintiffs to United in excess of the $300,000.00;

c. Declare the Notes for both the West Virginia Property and Maryland property paid in full;

d. And for such other relief as this Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**

100. Paragraphs 1 through 99 are hereby incorporated by reference as though fully restated herein.

101. Defendant United Bank entered into a fiduciary relationship with the Plaintiffs.

102. Specifically, this "special relationship" was instituted between United Bank and the Plaintiffs when Defendant United Bank accepted the Plaintiffs as customers/clients and entered into agreements to loan them money secured by the subject lots in WSMR.

103. This special relationship also exists with regard to the agency relationship which existed between United Bank and the Plaintiffs.

104. Plaintiffs were informed by United Bank that it was familiar with the WSMR development and that it was a trustworthy bank, representing itself as the State's largest bank and that the WSMR development was a legitimate non-fraudulent investment.

105. The Plaintiffs placed their trust and confidence in United Bank that they would act in their best interests and disclose any material facts within their knowledge which might influence the Plaintiffs decision to purchase financed lots in WSMR, and that they would not be involved or complicit with WSMR in fraudulent activity in relation to the investments they were about to make.

106. There existed a great disparity of position and bargaining power between Defendant and the Plaintiffs.

107. Only the Defendant was aware of the fraudulent conduct and nature of WSMR, the appraisers and officers of United Bank.

108. Plaintiffs were not in a position to obtain or possess this information.

109. Defendant owed a fiduciary duty to the Plaintiffs to alert them that their appraisal was based off of fraudulent information and that the money they were attempting to borrow was not supported by the actual value of the land.

110. As a result of the conduct described above in detail, which consisted of fraud and breach of trust, the Defendant breached its fiduciary duty to Plaintiffs.

111. As a result of the Defendant's breach of its fiduciary duty, the Plaintiffs were harmed.

112. The Defendant is liable to the Plaintiffs for breach of their fiduciary duty.

WHEREFORE, for all the reasons stated herein, the Plaintiffs respectfully pray for the following relief:

a. Compensatory damages related to the purchase, payments and existing debt and interest on the property the Plaintiffs purchased in WSMR, and for such other relief as this Court deems just and fair, in an amount to be determined by a jury at trial;

b. General damages for past, present and future mental anguish, loss of enjoyment of life, emotional distress and loss of good credit history and rating, as well as loss of investment opportunity, and other general compensatory damages, in a fair and just amount to be determined by a jury at trial;

c. Punitive damages, if it is determined that the Defendant was grossly negligent, reckless and/or engaged in intentional misconduct, in the amount to be determined by a jury at trial.;

d. Pre-judgment and post-judgment interest;

e. Costs and attorney fees expended in this civil action;

f. And for such other relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: April 17, 2017

Respectfully submitted,

/s/ Sari K. Kurland
Sari Karson Kurland, Esq.
The Kurland Law Group
Federal Bar No. 09174
211 Jersey Lane
Rockville, MD 20850
(301) 424-2834, Fax (240) 715-4658
sari@sarikurland.com
Counsel for Plaintiffs